OPINION
Defendant-Appellant Michael Brady was married to Juliana Brady, and they resided with their three children at 2333 North Main Street. On or about June 1, 2000, Michael Brady moved out and they each obtained a civil protection order against the other. After Brady moved out, Amy and Ken Brawner and their two children, as well as Robert Clay, Ken's brother, moved into the Main Street home. Each of these individuals were required to pay Juliana rent to help with expenses. Brady continued to visit the children, usually on the front porch of the Main Street residence, but occasionally he would take them to the park. Testimony also revealed Brady and Juliana phoned each other often, at least during the month of July preceding the incident involved herein.
Juliana testified that on the evening of July 18, she was sleeping on the loveseat in the living room with her infant son on the floor beside her, and Robert Clay asleep on the couch. She claimed that Brady called her several times from his cell phone that night, some calls even generated from her driveway. At approximately four A.M., Brady called Juliana and told her that this was her last chance to re-establish their relationship. Juliana told him she was sleeping and hung up the phone. Some time later, Juliana awoke to find Brady standing over her with a gun, a knife, and a white hand towel. Before she could scream, Brady put his hand over her mouth and pointed the gun at her nose, trying to force her upstairs.
At some point during this encounter, Amy came downstairs to meet her daughter who would soon be arriving. Juliana alleged that Brady initially blocked Amy from proceeding outside, but finally let her go. At about the time Amy came back into the house with her daughter, Brady and Juliana moved out on the porch. Amy proceeded upstairs and told her husband that Brady was there. At Amy's request, Ken went downstairs.
While on the porch, Brady told Juliana that he was contemplating killing her and the kids and himself. He pleaded with her that he needed help. Soon after these statements, Juliana vomited over the porch bannister, fearing for her life. She finally convinced Brady to put down the knife and put the gun in his pocket. Then she hugged him and promised they would get back together. She sent him home to pack and informed him she was going to take a shower.
When Juliana entered the house, she sat down and began crying. Ken told her to call the police, which she did. When the police arrived at the residence, Juliana was packing items to take to her mother's. The officers testified that she was nervous, upset and afraid while they were there. Also, Brady called at least once, possibly more, while the police were filling out their report. After Brady had left, Juliana discovered, and pointed out to police, that a kitchen window screen had been cut, and one of the porch chairs was under the window. Presumably, this is how Brady gained access to the home that morning. In defense, Brady elicited testimony from police officers that the screen was pushed out instead of in.
After the police completed their report, Juliana, her three children, and all of the Brawners went to Juliana's mother's home in Harrison Township. After they arrived, Brady began calling Juliana. He would tell her he planned to commit suicide and then hang up, and not answer the phone when Juliana called back. He would eventually answer the phone and then tell her this time he was really going to kill himself and would not answer the phone again for a period of time. This cycle continued for about four hours.
After several attempts by the police to track down Brady during the day, he eventually turned himself in to the psychiatric ward at a hospital, a little after midnight on July 20.
Testimony by the defense witnesses differed substantially from Juliana's testimony. Significantly, the defense witnesses portrayed Juliana as the party pursuing the relationship instead of Brady. Initially, the defense elicited testimony from Juliana on cross examination that Brady's employer obtained an injunction prohibiting Juliana from calling or visiting his place of employment, due to her disturbances there.
Amy Brawner and Chris Schneider both testified that on July 14, Brady, Juliana, Amy and Chris met at a night club, and then the four went back to Chris' apartment to "hang out." Eventually, Brady drove Juliana and Amy back to the Main Street home. Juliana denied this night out ever occurred.
Brady's uncle, with whom Brady resided, testified that Juliana called Brady all the time. In particular, on the evening of July 18, Juliana called Brady and asked him to babysit the following morning because she had an appointment. Brady told her he had to work, but suggested that he could ask his mother. Later in the discussion, he told Juliana he did not want to argue about it any further. In addition, Brady's uncle testified that he had never seen Brady with a gun.
Brady's mother also testified. She claimed to have received a call from Brady on July 18 asking her to babysit the following morning. She was unable to babysit due to a prior engagement. Brady's mother also testified that she overheard Brady in a phone conversation with Juliana on July 15 saying "I love you, too."
Amy Brawner contradicted some of Juliana's testimony regarding the morning of the alleged aggravated burglary. Amy stated that when she came downstairs, Brady did not block her progress to the door. She further maintained that she never saw Brady with a gun or knife that morning. Instead, she only witnessed Brady and Juliana engaged in a normal conversation. During the encounter and then later in the morning, Amy testified she never saw Juliana upset or afraid. Amy explained on the witness stand that she had lied to the Grand Jury and told the story Juliana asked her to tell because she feared reprisal from Juliana. If Juliana forced her to move out, she had nowhere to go, and she was seven months pregnant. Conversely, Juliana testified that she had recently had a sexual relationship with Amy's husband which ended their friendship and provoked Amy to lie at trial.
Brady was indicted for two counts of aggravated burglary, one under R.C. 2911.11(A)(1) with a firearm specification, the other under R.C.2911.11(A)(2), two counts of violating the terms of a protection order, one with a firearm specification, and one count of witness intimidation. The jury found Brady guilty of all counts except witness intimidation and the firearm specifications. Brady now appeals his conviction, raising the following assignments of error:
 I. The Trial Court erred in failing to grant Appellant's Motion to conform his conviction for Aggravated Burglary to the jury verdict.
 II. The conviction was against the manifest weight of the evidence as to Counts 1 and 5.
 I
Brady's first assignment of error is twofold. First, he argues in his brief that the verdict form for Count I was inconsistent in that the jury found him guilty of aggravated burglary, but found that "he did not have a firearm and that he did not inflict, attempt or threaten to inflict physical harm on Julie Brady." He claims that without one of these aggravating factors, he could only be convicted of burglary.
The burglary statute provides:
 No person, by force, stealth, or deception, shall do any of the following:
 (1) Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense.
R.C. 2911.12(A). The separate aggravated burglary statute contains identical language, but also requires one of the following:
 (1) The offender inflicts, or attempts or threatens to inflict physical harm on another;
 (2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.
R.C. 2911.11(A). Burglary as defined in R.C. 2911.12(A)(1) is a felony of the second degree; aggravated burglary is a felony of the first degree.
Count I of Brady's indictment for aggravated burglary contained the language found in R.C. 2911.11(A)(1), as quoted above. In addition, the trial court instructed the jury with the language of R.C. 2911.11(A)(1) and defined all of the essential terms. The verdict form then stated as follows:
 We, the jury, upon consideration of all the evidence, do find Defendant, Michael A. Brady guilty of the offense of aggravated burglary.
 We, the jury, find and specify that while committing the offense, the Defendant did not have a firearm on or about his person or under his control and displayed the firearm, brandished the firearm, indicated that he possessed the firearm, or used it to facilitate the offense.
 We, the jury, further find that the Defendant did not make an actual threat of physical harm to Juliana Brady with a deadly weapon. (Emphasis added.)
The language in the final paragraph on the above-referenced verdict form differs from what is actually required in the statute to establish the offense of aggravated burglary. The court's instructions to the jury clearly defined the offense under Count I as requiring a finding that Brady "did inflict or attempt or threaten to inflict physical harm upon another, to-wit: Juliana L. Brady." However, on the verdict form, the language was not identical, and it included the words, "with a deadly weapon." Consequently, the content of the final paragraph on the verdict form for Count I was meaningless as it pertains to this case. We then must consider whether the verdict form was sufficient without this specification.
Brady argues in his brief that pursuant to R.C. 2945.75, the jury was required to specifically find that he was guilty of one of the additional elements which "elevate" a burglary to an aggravated burglary, or have specified on the verdict form the degree of the offense. R.C. 2945.75(A) requires that "[w]hen the presence of one or more additional elements makes an offense one of more serious degree," the indictment or complaint, and additionally the guilty verdict must contain language of the additional elements or state the degree of the offense.
In support of this argument, Brady relies on State v. Gleason (1996),110 Ohio App.3d 240, and State v. Breaston (1993), 83 Ohio App.3d 410. In Gleason, the defendant was convicted of disseminating matter harmful to juveniles pursuant to R.C. 2907.31. The statute at that time provided that if the matter was just harmful, the defendant was guilty of a first degree misdemeanor; but if the matter was harmful and obscene, the degree was elevated to a felony. If the obscenity element was not proven, the defendant could still be convicted of disseminating matter harmful to juveniles. Because the obscenity element elevated the degree of the offense, R.C. 2945.75 applied. Although Gleason was properly indicted, the trial court failed to adequately instruct or place on the verdict form language requiring the jury to find the matter was obscene, contrary to R.C. 2945.75. Gleason, supra, at 247. Accordingly, the appellate court found that Gleason should only have been sentenced for a first degree misdemeanor. Id. at 248.
Similarly, in Breaston, the defendant was convicted of carrying a concealed weapon, a violation of R.C. 2923.12. That statute provided under subsection (D) that if the weapon was loaded or ammunition was readily available, the degree of the offense was increased from a first degree misdemeanor to a third degree felony. Breaston, supra, at 411. Again, the offense of carrying a concealed weapon could still be violated without the presence of ammunition. The presence of ammunition only elevated the degree of the offense, and therefore R.C. 2945.75 applied. Id. at 412. Because the verdict form did not contain the degree of the offense or the additional element, the court found Breaston should only be sentenced to the lesser degree of the offense. Id. at 414.
The distinction between separate offenses and offenses in which an additional element can elevate the degree is explained further in our case of State v. Vance (Nov. 26, 1997), Montgomery App. No. 16322, unreported. In Vance, the defendant was indicted for gross sexual imposition under R.C. 2907.05(A)(3), which included an essential element that the victim was under the age of thirteen. If the state could not prove the victim was under thirteen, then the jury would be required to acquit Vance since the state did not indict him under any other sections of the statute. R.C. 2907.05(A) contains five separate offenses, each with a separate unique element to complete that offense. These elements are unique to each crime, and therefore are essential, not additional elements. Consequently, we held that R.C. 2945.75 was not applicable. Id. at p. 4. Further, we found that a general verdict form which did not include the degree of the offense was sufficient, provided the indictment contained, and the jury was instructed, on all of the essential elements. Id.
Brady was charged in Count I with aggravated burglary. The element, "[t]he offender inflicts, or attempts or threatens to inflict physical harm on another," is one of the essential elements of aggravated burglary as charged in the indictment, not an additional element. Burglary and aggravated burglary are separate and distinct offenses with separate and distinct penalties. Moreover, aggravated burglary is always a felony of the first degree; no additional element raises the degree of the offense. Therefore, R.C. 2945.75 does not apply. The general verdict used for Count I is sufficient since the indictment and the jury instructions fully defined the offense.
In a similar fashion, Brady challenges his conviction of aggravated burglary in Count V. This count included the other aggravating factor, "[t]he offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control." The deadly weapon alleged was a knife. Brady argues that because the jury was not given the opportunity on the verdict form to make a specific finding that he had a knife on or about his person or under his control, the verdict should be reduced to a conviction for burglary. We disagree.
Initially, we should point out that this portion of the assignment of error is a direct attack on the actual verdict form, to which Brady failed to object below. Consequently, he has waived all but plain error. State v. Adams (1980), 62 Ohio St.2d 151, 153. Under the plain error analysis, we will not disturb the verdict below "unless, but for the error, the outcome of the trial clearly would have been otherwise." State v. Underwood (1983), 3 Ohio St.3d 12, syllabus.
In order to determine if there was any error, we must apply the same analysis as above. As previously stated, R.C. 2945.75 is not applicable when an individual is indicted for aggravated burglary under R.C.2911.11(A). There is no "additional elements [which] makes [the] offense one of more serious degree." Therefore, the verdict form need not specifically mention the aggravating factor or the degree of the offense. The general verdict form used in this case was sufficient since the indictment and the jury instructions specifically defined all elements of the offense. Accordingly, there was no error.
Based on the foregoing, Brady's first assignment of error is overruled.
 II
In his second assignment of error, Brady claims the verdicts were against the manifest weight of the evidence. When reviewing a manifest weight claim, the appellate court "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins (1997), 78 Ohio St.3d 380, 387. We have previously held that even in a manifest weight claim, we will not disturb the jury's conclusions concerning the credibility of witnesses and their conflicting testimony unless it is so incredible that it defies belief. City of Fairborn v. Boles (May 15, 1998), Greene App. No. 97 CA 110, unreported, at p. 3. Moreover, a verdict should only be overturned in extraordinary situations when evidence weighs heavily against the conviction. Thompkins, supra.
After reviewing the facts in this case, we agree that the testimony was conflicting between the parties. However, none of the evidence was so incredible that it defies belief. Therefore, we must give deference to the jury's conclusions regarding witness credibility and conflicting testimony. The verdicts are not against the manifest weight of the evidence. Brady's second assignment of error is overruled.
Judgment affirmed.
FAIN, J., and GRADY, J., concur.